**Durwood L. CURRIER, Plaintiff**

v.

**UNITED TECHNOLOGIES CORPORATION,**
**Defendant**

No. CIV.02–107–P–H.

United States District Court,
D. Maine.

April 28, 2004.

Louis B. Butterfield, Portland, ME, for Durwood L. Currier, Plaintiff.

Danielle Y. Vanderzanden, Day, Berry & Howard LLP, Boston, MA, Peter Bennett, Frederick B. Finberg, The Bennett Law

Firm, P.A., Portland, ME, for United Technologies Corporation, Defendant.

## ORDER ON POST–TRIAL MOTIONS

HORNBY, District Judge.

Durwood L. Currier sued his former employer, United Technologies Corporation ("UTC"), for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Maine Human Rights Act ("MHRA"). Specifically, Currier claimed that, in connection with a reduction in force at Pratt and Whitney's North Berwick facility, the company terminated him because of his age. On January 15, 2004, a jury awarded Currier $101,580 in back pay and $275,000 for noneconomic losses. On January 22, 2004, judgment entered against UTC in the amount of $101,580 back pay with respect to Count I (ADEA) and $275,000 noneconomic damages with respect to Count II (MHRA). UTC now has moved for judgment as a matter of law and for a new trial or, alternatively, remittitur. Although this has always been a close case, I conclude that there was sufficient evidence for the jury to find that Currier was terminated because of his age and to award the damages that it did. UTC's Motions for Judgment as a Matter of Law and for New Trial or Remittitur are DENIED.

Currier has filed a Motion to Amend or Correct the Judgment to add the back pay award to Count II (the state law claim) and to add an award of front pay and prejudgment interest to both counts. UTC does not object to the addition of back pay to his Count II award. As for prejudgment interest, I find that Currier waived such a claim under Count I, but is entitled to prejudgment interest under Count II. I decline to award front pay on either count. Accordingly, Currier's Motion to Amend or Correct the Judgment is DENIED IN PART and GRANTED IN PART.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In entertaining UTC's Motion for Judgment as a Matter of Law, I must look at all of the evidence in the record and draw all reasonable inferences in favor of Currier. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The jury could have found the following facts from the evidence presented at trial.

Pratt & Whitney is a division of UTC. Currier began working at Pratt & Whitney's plant at North Berwick in 1979. Over the years, he was promoted to increasing levels of responsibility. He was a senior industrial engineer, then a manager of productivity programs, then a business unit manager with supervisory authority over approximately 200 employees. UTC rewarded Currier with merit pay increases, promotions, and positive performance evaluations. In April of 1996, UTC asked Currier to replace another business unit manager who was struggling to meet company goals and financial targets. Currier improved that unit's performance and, in March of 1998, UTC recognized Currier's achievements in the unit by sending him on a trip to Japan. While Currier was in Japan, Thomas Mayes, twenty years younger than Currier, became the North Berwick plant's new operations manager and supervisor of Currier and six other business unit managers.

In 1998, a major Pratt & Whitney goal was to reduce lead time, the amount of time it takes to make a particular part. Currier implemented a lead time reduction strategy that year, which effectively reduced lead time. One side effect of the lead time reduction strategy was that cost per standard hour in Currier's unit increased. Although Currier's unit was able

to produce parts more quickly, the delivery dates remained the same. As a result, Currier's employees had nothing to do during the time between completing one order and time scheduled to start the next order.[1] Currier's unit still bore the payroll expense of these unproductive employees, however. Although Currier sent idle employees to help in other units, his unit continued to bear the employees' labor cost.

Mayes evaluated each business unit manager's performance in 1998. The performance evaluations consisted of scores in various categories, ranging from 1 to 5, with 5 being the best. The jury could have found that Mayes was unfairly inconsistent in scoring the business unit managers on their 1998 performance evaluations. As a result of the increased costs in Currier's unit, Mayes gave Currier a score of "2" in the cost category on his 1998 performance evaluation. A "2" meant "deteriorating." Mayes made upward adjustments to several other younger unit managers' cost category ratings to account for circumstances beyond their control, but he did not adjust Currier's cost rating to account for the lead time reduction strategy or the loaned labor. According to Mayes, a business unit manager's score in the area of "quality" was determined by the number of defects per million and the number of "escapes" (defective parts that left the facility). In 1998, Currier decreased defects per million by approximately 68% from the prior year and he had four escapes. Mayes gave Currier a "3" in the quality category. A "3" meant that the employee was "progressing." But Mayes also gave "3"s to two other, younger, business unit managers. One of those managers experienced

a 73% *increase* in defects per million and had 2 escapes. The other experienced a 68% *increase* in defects per million and had 7 escapes.

In 1999, Mayes moved Currier from his position as a business unit manager into a new position, manager of new business development. Mayes testified that he moved Currier, in part, because of the increased costs in Currier's business unit and because Mayes was told that Currier was having personnel problems in his unit. In this new position, Currier was responsible for bringing new business into the company. Currier had no measurable goals in this position; he was never given a written performance evaluation; and Mayes denied his request for any supervisory authority. Although Currier was unsuccessful at bringing new business into the company, he was given a merit pay increase in December of 1999.

In the beginning of 2000, it became apparent that business volume was down and that Pratt & Whitney might have to reduce its workforce. Currier did not believe that he was well suited for business development. He knew that two other business unit manager positions were about to open up and he told Mayes that he was interested in those positions. Mayes, however, filled the open business unit manager positions with two other employees, fifteen and twenty years younger than Currier. One of those employees had no experience as a business unit manager.

In February 2000, UTC promoted Mayes from operations manager to plant manager. As plant manager, Mayes was in charge of the entire Pratt & Whitney facility in North Berwick, with the excep-

---

**1.** Mayes testified that costs in Currier's unit increased because Currier had to resort to overtime in order to meet his lead time reduction goals. Tr. 102:2–9. Currier, however, disagreed. He testified that overtime in his unit did not increase and that the cost per standard hour increase was due to surplus labor. Tr. 241:13–25, 242:1, 244:7–18.

tion of one small department. In late April or early May of 2000, UTC informed Mayes that there was to be a reduction in force. UTC did not identify which positions were to be eliminated, but told Mayes that the North Berwick facility work force needed to be reduced by a certain percentage. Mayes discussed which jobs should be eliminated with Steve Pickett, operations manager, and Thomas Murphy, head of Human Resources. Together, Mayes, Pickett and Murphy identified job titles that would be affected by the reduction in force. Currier's position, manager of new business development, was among those eliminated. Currier, however, was not automatically terminated as a result. Instead, because Currier had been a business unit manager in the past, Mayes comparatively assessed Currier against the six other business unit managers. The assessment form, the Matrix, consisted of five considerations: "achieves results," "criticality of skills," "qualifications," "business orientation," and "interpersonal skills." The guidelines accompanying the Matrix stressed that employees should be evaluated based on "prospective considerations."

In rating Currier, Mayes did not ask for help from Currier's past supervisors and did not look at past performance evaluations or educational or training records. Mayes relied only upon his own experiences with and observations of the business unit managers over the two years leading up to the reduction in force. Mayes did not create a document explaining his reasons for assigning ratings in certain categories as part of the process. He simply circled a number from one to ten next to each of the five Matrix categories. Mayes rated Currier last among the business unit managers; he gave Currier an overall score of 13 out of a possible 35 points. Mayes gave the other business unit managers, all of whom are younger

than Currier, scores of 31, 28, 27, 27, 25, and 17. Mayes selected Currier to be terminated. Currier was 61 years old. Dr. Sat Gupta, a statistician, testified that the reduction in force at the North Berwick facility disproportionately affected older employees.

About three or four weeks before he terminated Currier, Mayes called Currier into his office and asked him if he would be interested in a position in China. The position that Mayes offered Currier was either plant manager or operations manager. Currier declined the position. When Mayes told Currier that he was terminated, he again offered him the China position. Currier again refused.

Currier sued UTC for violating both the ADEA and the MHRA. By agreement, the jury received a single instruction on liability that covered both the federal claim (Count I) and the state law claim (Count II). The jury found that UTC discriminated against Currier on the basis of his age and that UTC's violation was not "willful." UTC moved for judgment as a matter of law at the close of both Currier's case and the entire case.

## II. ANALYSIS

### A. UTC'S Renewed Motion for Judgment as a Matter of Law

In order to prove age discrimination, the plaintiff must first establish a *prima facie* case. "In a reduction of force case, a plaintiff must demonstrate: (1) he was at least forty years of age; (2) he met the employer's legitimate job performance expectations; (3) he experienced adverse employment action; and (4) his employer did not treat age neutrally or younger persons were retained in the same position." *Brennan v. GTE Govt. Sys. Corp.*, 150 F.3d 21, 26 (1st Cir.1998). Once the plaintiff establishes the *prima facie* case, a

rebuttable presumption of age discrimination arises and the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the decision." *Id.* If the employer meets this burden, the presumption of discrimination disappears and the burden returns to the plaintiff to prove that the employer's reason was a pretext for age discrimination. *Id.*

### (1) Currier's prima facie case

 UTC argues that Currier failed to establish the second and fourth prongs of the *prima facie* case. Specifically, UTC argues that Currier did not meet its legitimate job performance expectations in the position of manager of new business development and that it did not replace him with a younger employee. Def.'s Mot. for Judgment as a Matter of Law ("Def.'s Mot. for JML") at 6–9. There was evidence, however, that Currier's performance in the position of manager of new business development was adequate. For one, there was no suggestion in the record that UTC would have terminated Currier had there not been a reduction in force. In addition, Currier received a merit pay increase in December of 1999, after having been in the position for months. It is true that UTC eliminated the position of manager of new business development. However, UTC's decision to eliminate the manager of new business development position is not the adverse employment action underlying Currier's age discrimination claim. Currier does not allege that UTC discriminated against him by eliminating the new business development position.

Rather, he alleges that UTC discriminated against him when it chose to assess him against the other business unit managers and then ranked him lowest.[2] With regard to the position of business unit manager, Currier had several positive performance evaluations and a glowing recommendation from a prior supervisor. Currier also demonstrated that he was the oldest person considered; he was selected for termination; and each of the business unit managers retained was younger. Moreover, Currier's expert testified that, overall, the reduction in force disproportionately affected older employees.[3] The initial burden to establish a *prima facie* case is "not onerous." *Brennan,* 150 F.3d at 26. Currier met his burden.

### (2) Pretext

According to UTC, Mayes assessed Currier against the other six business unit managers using an age neutral form, the "Matrix," and chose Currier to be terminated because he ranked the lowest. UTC argues that Currier failed to offer sufficient evidence to prove that this legitimate, nondiscriminatory explanation was really a pretext for age discrimination. UTC's arguments are premised largely on the assumption that the jury believed its version of the facts. The jury, however, was entitled to reject Mayes' explanation for why he chose Currier to be terminated. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (A reviewing court "must disregard all evidence favorable to the moving party that the jury is not re-

---

**2.** I do not express any opinion on whether UTC was obligated to consider Currier for a business unit manager position once it decided to eliminate Currier's job. However, once UTC decided to consider Currier, it was obligated to do so in an age neutral manner.

**3.** UTC argues that since three of the four other employees terminated in connection with the reduction in force were not the oldest in their respective categories, the selections were age-neutral. Def.'s Mot. for JML at 7–8. That these employees were not the oldest, however, does not establish that age played no role in their selection.

quired to believe."). Although the Matrix form itself was facially age neutral, the jury could have concluded that Mayes ranked Currier lowest for a reason other than that he was the least competent business unit manager.

In the years before Mayes arrived at the North Berwick facility, Currier's career was on an upward trajectory; he received promotions, pay increases, and positive performance evaluations and recommendations. Just one month before Mayes arrived at the North Berwick facility, the company sent Currier on a trip to Japan to tour the Japanese facilities as a reward for his excellent performance. Once Mayes arrived, however, things changed dramatically for Currier. Mayes gave Currier an unfavorable performance evaluation and, the jury could have concluded, favored other, younger, employees by giving them adjustments on their evaluations and assigning them more generous scores in the "quality" category. Mayes then moved Currier from the position of business unit manager, where Currier supervised 200 employees, to manager of new business development, a newly created position without supervisory authority and for which Currier was not well suited. The jury could also have concluded that Mayes knew that a reduction in force was on the horizon when he filled two business unit manager positions that Currier sought with other, younger and less experienced, employees. Although Mayes testified that he did not consider Currier for those positions because Currier's unit did not meet its cost target and because he believed that Currier had a labor relations problem, the jury was free to disbelieve Mayes.

When Mayes assessed Currier in connection with the reduction in force, he ignored Currier's past performance evaluations and gave Currier a score that was approximately one half the score given to five out of the other six business unit managers. The five Matrix categories ("achieves results," "criticality of skills," "qualifications," "business orientation," and "interpersonal skills") were entirely subjective and the jury could well have been dissatisfied with Mayes' vague explanations as to why Currier received low scores in some of the Matrix categories. With regard to the "qualifications" category, Mayes testified that "based on [his] observations, the other business units, based on performance as shown, their ability to use those skills and their perception to manage business were better." Tr. 166:19–1. With regard to the "criticality of skills" category, Mayes testified that he had not seen Currier apply his skills to the "changing business environment." Tr. 166:11–18. The guidelines accompanying the Matrix stressed that scores should be based on "prospective considerations." Although "prospective considerations" or future contributions may be a legitimate business-related consideration, the jury could have found that Mayes applied the consideration in an age discriminatory manner. When deciding pretext, the jury was entitled to consider the subjectivity of this assessment process and the weakness of the reasons Mayes gave for his ratings, or whether they were masking age discrimination.

A few weeks before terminating Currier, Mayes offered him a high ranking position (plant or operations manager) in the China facility and Currier declined. The jury might have concluded that Mayes simply did not want Currier to remain at the North Berwick facility and so ranked him lowest in order to get rid of him. The jury might also have questioned whether Currier, who Mayes apparently thought was competent enough to hold a management position in China and whom previous managers had rated so favorably, could possibly have deserved so low a score on the

Matrix. In short, Currier presented sufficient evidence for the jury to disbelieve Mayes' explanation why he ranked Currier last among the business unit managers. The jury apparently found Mayes' testimony weak and ultimately unpersuasive.

Although there was sufficient evidence for the jury to conclude that Mayes ranked Currier lowest for some reason other than that Currier was the least competent business unit manager, there was no direct evidence that age discrimination, as opposed to mere dislike or something else, was the motivating factor. What Currier had was his own age (61), Mayes' age (41), the facts that all of the retained business unit managers were younger than Currier and that Mayes filled two open business unit manager positions with younger employees, and statistician Dr. Gupta, who testified that the overall reduction in force had a disproportionate effect on older employees.

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court considered whether "a defendant is entitled to judgment as a matter of law when the plaintiff's case consists exclusively of a *prima facie* case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." The Court held that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* at 147, 120 S.Ct. 2097. The Court added, however, that the

*prima facie* case plus sufficient evidence to disbelieve the employer's explanation will not always be sufficient. Whether judgment as a matter of law is appropriate depends on a number of factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 149, 120 S.Ct. 2097.

■ Here, Currier's *prima facie* case was sufficient, but not particularly strong. Currier did present a strong case that Mayes' explanations for the low ratings were unpersuasive. Yet although Currier presented evidence that his low Matrix score was unsupported by his past performance, Currier undisputedly missed his cost target in 1998. Unlike in *Reeves*, Currier did not produce evidence that his supervisor made derogatory comments about his age. (Currier testified that, until Mayes fired him, he did not feel that Mayes treated him differently because of his age. Tr. 284:6–10, 285:15–17.) But Currier did present evidence about the selection of younger, less experienced employees for the positions he sought, the ages of those retained when he was terminated, and a statistical analysis showing that the older employees were more likely to be selected for termination.

I instructed the jury that it could not find in favor of Currier unless it determined that he was terminated *because of his age.* Currier made a *prima facie* showing of age discrimination, offered enough evidence for the jury to discredit Mayes' reasons for ranking Currier lowest, and provided contested evidence from which the jury could infer pretext and age discrimination.[4] The case was not strong

---

4. UTC argues that, in order to demonstrate

that Mayes' explanation was pretextual, Cur-

but, considering *Reeves,* I conclude that there was sufficient evidence for the jury to infer that Currier's age was the real reason that Mayes selected him to be terminated.

### (3) The Admissibility of Dr. Gupta's Testimony

Dr. Sat Gupta, a statistician, testified that the reduction in force had a disproportionate effect on older employees. In both its Motion for Judgment as a Matter of Law and its Motion for a New Trial or Remittitur, UTC argues that Dr. Gupta's analyses were flawed, unreliable and therefore inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that his testimony unfairly tainted the verdict. Specifically, UTC complains that Dr. Gupta improperly analyzed all 183 salaried employees rather than only the 44 employees in job categories subject to the reduction in force, and that he failed to consider whether any factors other than age played a role in the lay off decisions.

■ Statistical analyses are admissible in disparate treatment cases "unless they are so incomplete as to be inadmissible as irrelevant." *McMillan v. Mass. Society for the Prevention of Cruelty to Animals,* 140 F.3d 288, 303 (1st Cir.1998). In this case, Dr. Gupta looked at the effect that the reduction in force had on the entire Pratt & Whitney plant at North Berwick, using a 2–sample T-test, a binary logistic regression model, and a Fischer's exact test. Based on the results of these tests, Dr. Gupta concluded that the overall reduction in force had a disproportionate effect on older employees and that employees over the age of 61 were significantly more likely to be selected for termination. If every employee at the North Berwick facility was at risk for being terminated, Dr. Gupta's testimony would be unquestionably relevant to whether the selection process was age neutral (and therefore relevant to the fourth element of the *prima facie* case). However, by the close of UTC's case in chief, the evidence established that ultimately only 44 out of the 183 salaried employees were at risk for the reduction in force. The 44 consisted of 5 categories of employees; one employee from each category was ultimately terminated. Each of the 5 categories of employees was assessed by one of 5 different supervisors. Mayes assessed only one category, the business unit managers. Although these details of how the termination decisions were made were apparent by the close of all the evidence, they were not clear when I admitted Dr. Gupta's testimony during Currier's case-in-chief.

rier had to show that, but for the age discrimination, another business unit manager would have been selected for termination. Def.'s Mot. for JML at 8–9. However, the cases that UTC cites for this proposition do not say that plaintiffs must prove someone else should have been selected. In *McGrath v. Lockheed Martin Corp.,* 48 Fed.Appx. 543 (6th Cir. 2002), the Sixth Circuit said that, because reductions in force often require the termination of qualified employees, the plaintiff had to show something more than that he was a good employee. In *Cruz Ramos v. Puerto Rico Sun Oil Co.,* 1998 U.S. Dist. LEXIS 22799 at *10 (D.P.R. April 20, 1998), the court held that evidence that the plaintiff was as qualified as his co-workers was not sufficient to establish that the employer's decision to rank the plaintiff lowest was a pretext for age discrimination. In Currier's case, the evidence was not so limited. In addition to offering evidence that he was qualified and competent, Currier demonstrated that Mayes placed an employee with no experience as a business unit manager in a position that Currier, with years of experience, sought. Even assuming that Currier had to demonstrate that another employee should have been selected for termination, he implicitly did so by showing that one of the business unit managers was less experienced than he.

The controversy surrounding Dr. Gupta's testimony started well before trial. On December 9, 2002, UTC filed a motion *in limine* seeking to exclude Dr. Gupta's testimony on the same grounds it advances now. The Magistrate Judge denied the motion, noting that "if credited by the jury, Dr. Gupta's testimony would tend to prove that whether a given employee was selected for termination in [Pratt & Whitney's] facility-wide reduction had a strong statistical correlation with age." Before trial, UTC filed another motion *in limine*, this time to exclude the ages of all employees who were not business unit managers. I denied the motion because it remained a jury question how the termination decisions were made and who made the decisions. I admitted Dr. Gupta's testimony at trial for the same reason. Dr. Gupta was not the last of Currier's witnesses. When Dr. Gupta took the stand, Mayes had already testified that only 44 employees were at risk for the reduction in force and that he assessed only 7 of those employees. Currier, however, was still free to contradict that testimony and to offer a conflicting version of how the termination decisions were made and who made them.[5] Further testimony corroborating Mayes' version of the facts did not come in until UTC's case-in-chief, when two of UTC's witnesses testified that only 44 employees were assessed and that five different supervisors completed the five different assessments.[6] *See* Def.'s Mot. for New Trial at 10.

■ Dr. Gupta's testimony was properly admitted at the time it was offered because how the termination decisions were made had not yet been established. UTC objected to Dr. Gupta's testimony while he was on the witness stand and moved for judgment as a matter of law at the close of all the evidence. But UTC did not ask me to make admission of the testimony conditional, *see* Fed.R.Evid. 104(b), nor did it move to strike Dr. Gupta's testimony or for a mistrial at the end of its case-in-chief when, it now argues, it was finally undisputed that only 44 North Berwick facility employees were considered for termination and that Mayes played a direct role in selecting only one employee, Currier.[7] Dr. Gupta's testimony was relevant to a disputed issue of fact when I admitted it. Because UTC took no steps thereafter to remove Dr. Gupta's testimony from the jury's consideration, it cannot now complain that it was unfairly prejudiced by the jury having heard the testimony.[8]

UTC's argument that Dr. Gupta should have worked variables other than age into his analyses is appropriately directed to

---

5. *See also* Pl.'s Opp'n Mot. to Def.'s Mot. for New Trial at 4 ("[U]ntil the parties were in the midst of trial, Defendant never provided information showing that any particular employees or groups of employees were less susceptible than others to layoff.").

6. UTC acknowledges that the facts surrounding the termination decisions were not established when Dr. Gupta took the stand. Def.'s Reply to Pl.'s Opp'n Mot. (New Trial) at 2–3 ("[T]he Court admitted Dr. Sat Gupta's testimony without foundation, during Plaintiff's case-in-chief *before* Defendant proffered the undisputed evidence that Currier was not similarly situated with respect to all other 182 salaried employees in North Berwick, whom Gupta statistically compared.").

7. UTC's lawyer did move to strike twice during Dr. Gupta's testimony. Tr. 392:5–18. Neither motion was directed at the substance of Dr. Gupta's testimony, however. The first motion was made in response to Dr. Gupta's characterization of the case as an "age discrimination case." I responded by telling the jury to disregard what kind of a case it was. Tr. 392:3–7. The second "motion to strike" was actually an objection to Dr. Gupta going beyond the scope of the question posed to him. I sustained the objection. Tr. 392:8–17.

8. Moreover, contrary to UTC's assertions, the jury could find that Dr. Gupta's analyses remained relevant even at the close of all the evidence. Although by the end of trial the

the weight, and not the admissibility, of Gupta's testimony. That the layoff decisions might have been explained by something other than age discrimination does not make Dr. Gupta's analyses so incomplete as to be irrelevant. UTC challenged Dr. Gupta's testimony extensively through cross-examination and through the presentation of its own expert witness, who said that Dr. Gupta's methods were unreliable. But UTC did not offer competing statistical evidence using the variables that UTC faults Dr. Gupta for failing to consider. I conclude that Dr. Gupta's testimony was properly admitted and not unfairly prejudicial.

### (4) The Jury Instructions

Finally, UTC argues that the jury instructions were confusing and that I should have included several of its proposed instructions. These are all arguments that UTC raised at trial. I see no reason to change the rulings or elaborate further upon them.

UTC's Motion for Judgment as a Matter of Law is DENIED.

### B. UTC's MOTION FOR A NEW TRIAL, OR IN THE ALTERNATIVE, REMITTITUR

### (1) New Trial

UTC argues that it is entitled to a new trial because I erroneously admitted Dr. Gupta's testimony, and failed to instruct the jury on how it should weigh statistical evidence. Dr. Gupta's testimony was admissible and the jury was free to give his testimony the weight it saw fit. UTC's proposed instruction on statistical evidence derived from cases decided at the summary judgment stage. I decided then and now that those cases do not call for a separate instruction on statistical evidence. UTC challenged Dr. Gupta's testimony extensively on cross-examination, through expert testimony, and during its closing argument. The jury was equipped with all the information it needed to weigh Dr. Gupta's testimony properly; a special instruction on statistical evidence was unnecessary. The Motion for a New Trial is DENIED.

### (2) Remittitur

Remittitur is appropriate only if UTC can show that the damage award is "grossly excessive, inordinate, shocking to the conscience ... or so high that it would be a denial of justice to permit it to stand." *Koster v. TWA*, 181 F.3d 24, 34 (1st Cir. 1999). UTC argues that the evidence was not sufficient to support any award of back pay because Currier was offered, and refused to accept, two comparable positions:

---

evidence established that only 44 employees were at risk and that Mayes personally assessed only the 7 business unit managers, the extent of Mayes' involvement in the overall reduction in force remained a jury question. Mayes testified that UTC provided a percentage by which the work force must be reduced and that he, Pickett, and Murphy together identified the job categories subject to the reduction in force. Tr. 152:9–17; 153:9–18. Thus, Mayes helped identify the pool of employees whose jobs would be at risk in the first place. As Currier points out in his opposition motion, "removing groups of younger employees from consideration in the first stage of the process is no different from pre-

ferring younger workers in the second stage of the process." Pl.'s Opp'n Mot. at 4. And although Mayes personally assessed only the business unit managers, he was in charge of the entire facility at the time of the reduction in force. The entire plant, with the exception of one small "T-services" unit, reported to him. Tr. 42:18–25. The jury could have concluded that Mayes' influence pervaded the plant and the decision making. UTC's arguments regarding Mayes' limited role may have diminished the probative value of Dr. Gupta's testimony, but whether the reduction in force was age discriminatory remained a question for the jury.

an off-shift administrator position and a management position in China. This is a mitigation argument where UTC bears the burden of proof. Currier testified that he was not offered the off-shift administrator position and the jury was free to believe him. Moreover, the duty to accept substantially equivalent employment extends only to jobs available "in the relevant geographic area." *Quint v. A.E. Staley Mfg.*, 172 F.3d 1, 16 (1st Cir.1999). China is outside the relevant geographic area in this case, and the jury was entitled to find that Currier did not fail to mitigate his damages by declining that job.

UTC also argues that the back pay award is excessive because the evidence showed that Currier stopped looking for work in March of 2001 when he applied for Social Security benefits. Currier testified that "[a]ny serious searches" for work stopped once he received Social Security. Tr. 313:13–16. Currier also testified, however, that, despite receiving Social Security benefits, he was "still out there," that he went to truck driving school in Portland, and that he never stopped looking for work. Tr. 269:1–14; 313:19–20. Whether or when Currier failed to mitigate damages by withdrawing from the labor market was for the jury to decide. Currier sought back pay in the amount of $338,931; the jury's award of $101,580 is not grossly excessive.[9]

▮▮▮▮▮ UTC also challenges the jury's award of $275,000 to compensate Currier for noneconomic losses such as emotional distress and loss of enjoyment of life. Under 5 M.R.S.A. § 4613(2)(B)(8)(e), the jury was free to award Currier damages for "emotional pain, suffering, inconvenience,

mental anguish, loss of enjoyment of life, [and] other nonpecuniary losses." The jury heard evidence that Currier suffered emotional distress and financial stress as a result of his termination. "Translating legal damages into money damages—especially on occasions which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken." *Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir.1991). The jury's award in this case is not so large as to "shock the conscience." The Motion for Remittitur is DENIED.

## C. CURRIER'S MOTION TO AMEND OR CORRECT THE JUDGMENT

### (1) Back pay under Count II

Currier asks that the judgment on Count II be amended to include the back pay award of $101,580. The MHRA does provide for recovery of back pay. 5 M.R.S.A. § 4613(2)(B). UTC agrees that the jury's back pay award applies under Count II as well as Count I. Opp'n Mot. at n. 2. That portion of Currier's motion is therefore GRANTED.

### (2) Front Pay

During the trial, I told the parties that they could present evidence regarding the appropriateness of front pay at the end of the trial outside the presence of the jury. Tr. 444:6–13. Neither party offered such evidence. Currier now requests front pay on both Count I and Count II to compensate him for the time between entry of judgment and September, 2004, the date Currier would have retired had he not been terminated.

---

9. UTC also argues that it was entitled to have back pay damages offset by money earned through other employment, severance payments, and pension payments. I instructed the jury that it must deduct severance, vaca- tion pay, and wages obtained from other employment. Nothing about the jury's verdict suggests that it ignored my instruction. As far as pension payments are concerned, I see no reason to change my ruling at trial.

Front pay is an available remedy under both the ADEA and the MHRA. *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 614 (1st Cir.1985); 5 M.R.S.A. § 4613(2)(B). Front pay is generally available only if reinstatement is impracticable or impossible. *Wildman*, 771 F.2d at 614. *See also Traylor v. Windsor School Dept.*, 1999 Me.Super. LEXIS 249 (Me.Super.Ct.1999). Currier argues, and UTC does not contest, that reinstatement for such a short period of time, January to September, would be impracticable. I agree. However, even in cases where reinstatement is impracticable, front pay is a discretionary remedy. *See Powers v. Grinnell Corp.*, 915 F.2d 34, 42–43 (1st Cir.1990). The Law Court has not defined what considerations inform a court's decision whether to award front pay under the MHRA, but has indicated its general willingness to follow the lead of federal law. *E.g., Maine Human Rights Com. v. Auburn*, 408 A.2d 1253, 1261 (Me.1979). Under federal law, since future damages are usually speculative, courts, in exercising their discretion, should consider all of the circumstances of the case. *Powers*, 915 F.2d at 43. A plaintiff's failure to mitigate damages is relevant to his entitlement to front pay. *E.g., Dilley v. SuperValu, Inc.*, 296 F.3d 958, 967 (10th Cir.2002).

In this case, there was evidence at trial that Currier stopped "serious searches" for employment after he began receiving Social Security payments in March 2001. I instructed the jury that it could not award back pay for any period of time after it found that Currier withdrew from the labor market. Although Currier requested and offered evidence that he was entitled to nearly $339,000 in back pay, the jury awarded him $101,580. The jury could have concluded that Currier withdrew from the labor market or retired on some date prior to trial, and awarded less back pay than Currier sought for that reason. A front pay award in this case would contradict the jury's implicit findings. *Newhouse v. McCormick & Co.*, 110 F.3d 635, 641 (8th Cir.1997). Even without the jury's implicit findings, however, I would decline to award front pay under either count based on my own evaluation of the evidence.[10] Currier's request for front pay is **DENIED**.

### (3) Prejudgment Interest

Currier requests prejudgment interest under both Count I and Count II.

#### (a) Count I—ADEA

Whether to award prejudgment interest on the federal claim is generally a jury question. *See Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982) (ADEA). Currier correctly notes that an ADEA plaintiff is not entitled to both liquidated damages and prejudgment interest. Because Currier initially sought both liquidated damages and interest, I expressed concern at trial that we would have to know "what the jury is doing" on the question of prejudgment interest, Tr. 422:9–22, so as to avoid improper duplica-

---

10. The First Circuit has held that courts should consider the availability of liquidated damages when deciding whether to award front pay on the federal claim. *Powers v. Grinnell Corp.*, 915 F.2d 34, 42–43 (1st Cir. 1990). The reason that it is appropriate to consider the availability of liquidated damages on the federal claim is that the federal statute is designed to make victims of discrimination whole, not to grant them a windfall.

*See id.* Liquidated damages, therefore, reduce the need for front pay. Since the ADEA does not recognize noneconomic damages, the $275,000 Currier received under Count II on top of his back pay has the same effect as a liquidated damage award. Thus, assuming that the awards on both counts are upheld, the generous noneconomic damage award under Count II militates against awarding front pay on Count I's federal claim.

tion. Currier's lawyer agreed that Currier could not recover both liquidated damages and prejudgment interest. He then withdrew the claim to prejudgment interest. Tr. 426 18–21. He now argues that "[a]sking a jury to determine an amount of prejudgment interest as part of its damage award when the Court also submits the question of 'willful violation' would lead to either overly complex jury instructions or uncertainty in the verdict." Reply Mem. at n. 4. I am confident, however, that had Currier not withdrawn his claim to prejudgment interest, we could have crafted an appropriate instruction, directing the jury to reach prejudgment interest only if it found that UTC's violation of the law was not willful. Because Currier did not ask that the question of prejudgment interest be submitted to the jury, he waived his right to request prejudgment interest on Count I. *See Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982) (ADEA).

### (b) Count II—MHRA

█ Currier's entitlement to prejudgment interest on Count II is governed by state law. Unlike prejudgment interest on the federal claim, prejudgment interest on the state law claim is not a jury question. Therefore, Currier did not waive his right to request prejudgment interest on Count II by failing to request that the issue be submitted to the jury.

In 2003, the Maine Legislature repealed 14 M.R.S.A. § 1602, which provided that "prejudgment interest shall be assessed" to the prevailing party, and added a new provision, providing that prejudgment interest "is allowed." 14 M.R.S.A. § 1602–B (Supp.2004). The new legislation "applies to judgments entered on or after July 1, 2003." Pub.L. c. 460, § 13. Section 1602–B(5) provides that "[o]n petition of the nonprevailing party and on a showing of good cause, the trial court may order that interest awarded by this section be fully or partially waived." UTC objects to the award of prejudgment interest, arguing that it is impossible to calculate prejudgment interest separately on Counts I and II because the jury did not render separate verdicts. The jury was not asked to deal with the ADEA count and the MHRA count separately, however, because the standard of liability on each count is the same. UTC did not object to, and I have granted, Currier's motion to add the back pay award to the MHRA count for that very reason. UTC does not advance any other reason, or "good cause," for why Currier should be denied prejudgment interest on Count II. I will allow prejudgment interest on Count II.

Section 1602–B(5) provides that interest begins to accrue at "the time of notice of claim setting forth under oath the cause of action, [is] served personally or by registered or certified mail upon the defendant." *Id.* Currier filed a sworn charge of discrimination with the Maine Human Rights Commission and the Commission mailed the charge to UTC on September 15, 2000. Prejudgment interest began to accrue on that day.[11] Pursuant to section

---

11. Nothing in the record demonstrates that the sworn charge was served personally or by registered or certified mail, as the statute requires, but UTC does not challenge the accrual date on this ground. UTC does argue that prejudgment interest should not start to accrue until the date that Currier stopped receiving severance payments. However, UTC does not offer any information as to when it was that the severance payments ceased. At trial, Currier testified that he received 16 weeks of severance pay. Assuming that the payments started when Currier was terminated, his payments would have stopped sometime in early October. The date is speculative, however. Moreover, section 1602–B(5) clearly provides that prejudgment interest begins to accrue on the date that the defendant receives notice of the claim. Ac-

1602–B(7)(B), "the rate of prejudgment interest is the one-year United States Treasury bill rate" plus 1%.

### III. CONCLUSION

UTC's motions for Judgment as a Matter of Law and for a New Trial or Remittitur are DENIED. Currier's Motion to Amend or Correct the Judgment is GRANTED in part as follows: Judgment on Count II shall be amended to include the $101,580 back pay award but the amounts are duplicative and Currier may not recover the back pay award twice. I also award prejudgment interest on Count II from September 15, 2000. Prejudgment interest on Count I has been waived and I decline to award front pay on either Count. Accordingly, the remainder of Currier's motion is DENIED.

So ORDERED.

cordingly, I find that September 15 is the proper accrual date.